UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TRACEY WAGONEKA, ET AL | § | |
| | § | |
| v. | § | CIVIL NO. 4:18-CV-859-SDJ |
| | § | |
| KT&G USA CORPORATION | § | |

## **MEMORANDUM OPINION & ORDER**

Plaintiffs Rick Di Donato, Ashley "Ed" Murry, and Tracey Wagoneka, all of whom are Caucasians formerly employed by Defendant KT&G USA Corporation ("KT&G USA"), allege that KT&G USA violated Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 by terminating Plaintiffs' employment and replacing them with non-Caucasian, Korean individuals.

KT&G USA has moved for summary judgment seeking dismissal of all claims asserted by Di Donato, Murry, and Wagoneka. (Dkt. #30). KT&G USA argues that Plaintiffs Di Donato and Murry cannot establish a prima facie case of discrimination and that neither one has evidence that KT&G USA's legitimate, non-discriminatory reason for terminating his employment was a pretext for unlawful discrimination. KT&G USA further contends that Wagoneka's discrimination claims should be dismissed because she lacks evidence sufficient to show a genuine issue of material fact concerning KT&G USA's honest belief that she voluntarily resigned her employment with the company. Plaintiffs responded to the motion, (Dkt. #33), KT&G USA filed a reply, (Dkt. #37), and Plaintiffs submitted a sur-reply, (Dkt. #39).

The Court, having considered the motion and subsequent briefing, as well as the record and applicable law, concludes that the motion should be **GRANTED** as to the claims asserted by Plaintiffs Di Donato and Murry, and **DENIED** as to the claims asserted by Plaintiff Wagoneka.

## I.

### KT&G USA'S SUMMARY-JUDGMENT MOTION AS TO PLAINTIFFS DI DONATO AND MURRY

### A.

KT&G USA is a subsidiary of KT&G Corporation, a Korean company that produces tobacco. KT&G USA sells tobacco products in the United States under the names Carnival and TimeLess Time. In 2016, KT&G USA made structural changes in an effort to boost its declining tobacco sales in the United States. At that time, Hoyeon Jang served as KT&G USA's Director of Sales and Marketing, managing both the sales and marketing functions for the company. KT&G USA's 2016 structural change involved: (1) splitting the sales and marketing functions into two separate departments, (2) creating a new position, "Head of U.S. Sales," and hiring Di Donato for this position in October 2016, and (3) allowing Di Donato to bring on two Regional Vice Presidents, Murry and Rick Waples, to manage the east and west sales divisions, respectively. Jang continued to lead the marketing function for KT&G USA.[1]

As Head of U.S. Sales, Di Donato was responsible for: establishing and executing a business plan to achieve targeted sales; hiring, training, supervising, and

---

[1] Although Murry's offer letter references his position as a "Senior Manager," he testified that his title was "Vice President," and he called it "Regional Vice President."

discharging employees within the sales organization; and preparing and presenting sales reports. Di Donato reported directly to the President of KT&G USA. As a Regional Vice President, Murry supervised KT&G USA's sales staff throughout the eastern half of the United States and had responsibility for ensuring that the sales staff met the company's targeted sales goals. Murry reported to Di Donato.

KT&G USA's 2016 structural change did not bring about the hoped-for increase in tobacco sales. To the contrary, between October 2016, when Di Donato was hired, and August 2017, KT&G USA's tobacco sales in the United States continued to decline—a fact undisputed by Plaintiffs. During 2017, KT&G USA repeatedly communicated with Di Donato and Murry concerning the declining sales and expressed its expectation that sales must improve. In August 2017, ostensibly based on Di Donato and his leadership team's failure to increase sales, KT&G USA restructured again, this time eliminating Di Donato's position and terminating his employment. The second restructuring split Di Donato's job duties between Jang and KT&G USA President Kil Hon Hyun. Specifically, Hyun assumed responsibility for KT&G USA's overall sales performance, while Jang assumed many of the sales responsibilities that he had handled before Di Donato's hiring, such as day-to-day management of the company's regional sales managers and implementation of effective sales programs. Jang's title reverted to "Director of Sales and Marketing," the position he had held prior to Di Donato's employment, and the "Head of U.S. Sales" position ceased to exist at KT&G USA.

As with Di Donato, KT&G USA terminated Murry's employment in August 2017 and eliminated Murry's position of "Regional Vice President." KT&G USA assigned Murry's duties to three individuals. Carol Boliter, a Caucasian of South African origin, and Sang Ho Park, a person of Korean origin, split Murry's sales duties. Jang, a person of Korean origin, assumed Murry's personnel duties. Rick Waples, who also served as a Regional Vice President under Di Donato, remained under the employ of KT&G USA. However, when KT&G USA eliminated the Regional Vice President position, the company reassigned Waples to serve as "Manager of National Sales Accounts" (e.g., multistate chain stores). In turn, KT&G USA assigned Waples's prior duties as Regional Vice President to Boliter, Park, and a third Regional Sales Manager, Ahmad Saber, who is of Afghani origin. As with Murry, Jang assumed Waples's personnel responsibilities.

## B.

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "*genuine issue of material fact*" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 476.

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## C.

When relying solely on indirect or circumstantial evidence, as Plaintiffs do here, claims of unlawful discrimination under Title VII  and section 1981 are

analyzed using the *McDonnell Douglas* burden-shifting framework.[2] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Melvin v. Barr Roofing Co.*, 806 F.App'x 301, 305 (5th Cir. 2020) (per curiam) (applying *McDonnell Douglas*'s three-step approach). The three-step burden shifting approach requires first that "a Title VII plaintiff must first set forth a prima facie case of race-based discrimination." *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (citing *McDonnell Douglas*, 411 U.S. at 802). If a plaintiff successfully sets forth a prima facie case, then "the burden of production shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The reason for the employee's rejection "must be legally sufficient to justify a judgment for the defendant." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Finally, if the employer satisfies this burden, then "the employee must offer some evidence that the reason proffered was a pretext for discrimination, or that a 'motivating factor' for the employment decision was the plaintiff's protected characteristic." *Rogers*, 827 F.3d at 408 (footnote and citation omitted).

---

[2] Plaintiffs have asserted claims under both Title VII and section 1981. However, as the Fifth Circuit has explained, "[w]hen used as parallel causes of action, Title VII and section 1981 require the same proof to establish liability," and "it would be redundant to refer to [both] of them." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999). Thus, "specific consideration of [the section 1981 claim] for employment discrimination is necessary only if [its] violation can be made out on grounds different from those available under Title VII." *Parker v. Miss. State Dep't of Pub. Welfare*, 811 F.2d 925, 927 n.3 (5th Cir. 1987). Plaintiffs do not assert any distinction between their claims and urge the Court to consider them as one. Accordingly, only specific consideration of the Title VII claims is needed.

To establish a prima facie case of discrimination under Title VII, a plaintiff must show:

> (1) [T]hat [he or] she is a member of a protected class, (2) that [he or] she was qualified for the position . . . (3) [that he or] she was subject to an adverse employment action, and (4) [that he or] she was replaced by someone outside [his or] her protected class or was treated less favorably than other similarly situated employees outside [his or] her class.

*Haire v. Bd. of Sup'rs of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013).

### D.

KT&G USA does not contest that Plaintiff Di Donato is a member of a protected class, was qualified for his position with the company, and was subject to an adverse employment action. KT&G USA contends, however, that Di Donato's discrimination claims fail because he cannot meet the fourth prong required to establish a prima facie case of discrimination under Title VII—that he was replaced by someone outside his protected class or was treated less favorably than other similarly situated employees outside his class. The Court agrees with KT&G USA on this point.

Di Donato asserts that KT&G USA discriminated against him by replacing him with a Korean male whom the company promoted to fill Di Donato's position. But the uncontested evidence shows that Di Donato was not replaced. It is undisputed that, when KT&G USA eliminated Di Donato's position as Head of U.S. Sales and terminated his employment, his job duties were absorbed by the company's president, Hyun, and by Jang, who had been leading the marketing function for KT&G USA during Di Donato's tenure. *See* (Dkt. #30 at 4) (KT&G USA's summary-judgment motion asserts as an undisputed fact that Di Donato's job duties were absorbed by

Hyun and Jang following Di Donato's termination); (Dkt. #33 at 9) (Di Donato confirms in his response to KT&G USA's motion that the reassignment of his job duties to co-workers Hyun and Jang following his termination is "not disputed.").

"[W]hen an employee's position has been eliminated and the job duties reassigned to existing employees, that employee has not been replaced." *Dulin v. Dover Elevator Co.*, 139 F.3d 898, 1998 WL 127729, at *3 (5th Cir. 1998) (unpublished table opinion); *see also Griffin v. Kennard Indep. Sch. Dist.*, 567 F.App'x 293, 294 (5th Cir. 2014) (per curiam) (explaining that the Fifth Circuit "ha[s] held that an employee has not been replaced . . . when his former duties are distributed among other co-workers" (internal quotation marks omitted)); *Rexses v. Goodyear Tire & Rubber Co.*, 401 F.App'x 866, 868 (5th Cir. 2010) (per curiam) (affirming district court's ruling that a terminated employee was not replaced when his former duties were absorbed by two existing employees).[3]

Here, the uncontroverted evidence shows that, at the time Di Donato was terminated, KT&G USA was reintegrating its sales and marketing functions. Having determined that separating the two functions had not increased sales, KT&G USA reintegrated the sales and marketing departments into a single department. As part of the company's restructuring, KT&G USA eliminated Di Donato's position as Head of U.S. Sales and terminated his employment. The parties agree that, following

---

[3] Di Donato contends that *Howard v. United Parcel Serv., Inc.*, 447 F.App'x 626 (5th Cir. 2011) (per curiam), is instructive because it demonstrates that an employee can establish a prima facie showing of discrimination when his position is eliminated and a single co-worker outside the protected class assumes his job duties. *Howard* is distinguishable, however, because here it is undisputed that Di Donato's former duties were absorbed by two existing employees.

Di Donato's termination, Hyun assumed responsibility for KT&G USA's overall sales performance, and Jang reassumed a number of the sales responsibilities that he had performed before Di Donato began at the company, such as day-to-day management of regional sales managers and implementation of effective sales programs. *See* (Dkt. #30 at 4); (Dkt. #33 at 9). The record before the Court confirms that there exists no genuine issue of material fact as to whether Di Donato was "replaced" by someone outside his protected class—Di Donato was not "replaced."

Di Donato's alternative argument, that he established a prima facie case by showing that he was treated less favorably than other similarly situated employees outside his class, is also unavailing. Di Donato first points to the racial composition of KT&G USA's senior management, stating that before Di Donato's and Murry's terminations half of the company's senior managers were non-Asian but that after their terminations KT&G USA had no non-Asian senior management or higher-level employees. However, general statistical evidence alone cannot support a prima facie case of discrimination in the context of the individual claims made in this case. "In making this [prima facie] showing, an individual plaintiff pursuing an individual claim may not rely on the type of pattern-or-practice evidence that is acceptable in class action suits alleging similar conduct, such as general statistical evidence." *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008); *see also id.* (holding that plaintiff could not rely on general statistical evidence to establish his prima facie case of discrimination and instead "must present prima facie evidence that his pay was lower than *specific* employees who are not members of the protected

9

class"); *Thompson v. Leland Police Dep't*, 633 F.2d 1111, 1114 (5th Cir. 1980) ("[S]tatistical evidence alone does not establish or necessarily imply racially discriminatory practices."). Put simply, Di Donato's individual disparate-treatment claim "must rely on more than general statistical evidence." *Anthony v. Galveston Cnty.*, No. 3:12-CV-00269, 2014 WL 109352, at \*2 (S.D. Tex. Jan. 10, 2014) (Costa, J.); *see also id.* (concluding, in a disparate pay suit, that "[r]ather than relying solely on statistics," such an individual disparate-treatment plaintiff "must present *prima facie* evidence that [her] pay was lower than [that of] *specific* employees who are not members of the protected class").

Di Donato further contends that he has set forth a prima facie case of discrimination because he was treated less favorably than Jang, a Korean, whom KT&G USA never disciplined or terminated despite the company's sales declining both before and after Di Donato's employment. KT&G USA's treatment of Jang, however, is relevant only if Di Donato's circumstances were "nearly identical" to Jang's. *See Morris v. Town of Independence*, 827 F.3d 396, 401 (5th Cir. 2016) (explaining that, "[w]ith respect to the 'similarly situated employees' requirement, a plaintiff must show that he was treated less favorably than others 'under nearly identical circumstances,'" which means that "employees with different supervisors, who work for different divisions, . . . who have different work responsibilities" are not similarly situated (internal quotation marks omitted)).

Di Donato's and Jang's circumstances at KT&G USA were not "nearly identical." Before Di Donato was hired, Jang was KT&G USA's Director of Sales and

Marketing, managing both the sales and marketing functions for the company. When KT&G USA split the sales and marketing functions into two separate departments in 2016, Jang continued to manage the marketing function, while Di Donato was hired to manage the sales function as part of a newly created position, "Head of U.S. Sales." Thus, during Di Donato's tenure with KT&G USA, he and Jang worked in different departments of the company. When KT&G USA terminated Di Donato and eliminated his position, KT&G USA did so as part of its reintegration of the sales and marketing departments into a single department. At that time, Jang took on some of Di Donato's prior job responsibilities, while Hyun absorbed others. In sum, Jang and Di Donato worked in different departments for KT&G USA and Jang never held the same title, position, or responsibilities as Di Donato either before, during, or after Di Donato's employment with the company. At all relevant times, Jang managed KT&G USA's marketing function, a job responsibility Di Donato never had. Moreover, Di Donato solely managed sales for the company, while Jang's duties were never limited to the management of sales. The fact that Jang had certain sales responsibilities like Di Donato did—duties that Jang shared with Hyun after Di Donato's departure—does not show that Di Donato's and Jang's circumstances were "nearly identical." *See, e.g., Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009) (noting that employees are generally not similarly situated if they have different supervisors, different work responsibilities, or work for different divisions of a company).[4]

---

[4] Di Donato has provided no other evidence concerning Jang or showing that Di Donato was terminated because of his race or national origin.

For all these reasons, Di Donato has failed to establish a prima facie case of discrimination against KT&G USA. Summary judgment as to Di Donato is **GRANTED** in favor of KT&G USA, and Di Donato's claims are dismissed.[5]

## E.

As with Di Donato, Murry's discrimination claims fail because he cannot meet the fourth prong required to establish a prima facie case of discrimination under Title VII—that he was replaced by someone outside his protected class or was treated less favorably than other similarly situated employees outside his class.

Murry claims that KT&G USA discriminated against him by replacing him with a Korean male, Sang Ho Park. However, as with Di Donato, it is undisputed that, following his termination, Murry's job duties were absorbed by multiple

---

Di Donato and Murry claim that there is evidence that KT&G USA's management had an "animus" towards non-Korean people, but it is undisputed that no one at KT&G USA ever made a racist comment toward Di Donato or Murry, nor do Plaintiffs suggest that there is any evidence of animus towards Caucasian employees. The alleged comments referenced by Di Donato and Murry are attributed to persons uninvolved with the adverse employment actions complained of by Di Donato and Murry and implicate only comments regarding Black individuals, Indian individuals, and women. *See* (Dkt. #33 at 21–22). Because Di Donato and Murry are Caucasian men, none of the purported comments apply to them. *See, e.g.*, *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012) (explaining that, "if the evidence of the workplace environment for the employees of a plaintiff's race does not show frequent, severe, and pervasive hostility, then evidence of hostility towards a different racial group is not much support for the plaintiff's claim"); *Cuthbertson v. Am. Fed'n of Gov't Emps.*, No. 3:10–CV–2107–D, 2012 WL 4321742, at *4 (N.D. Tex. Sept. 21, 2012) (granting summary judgment to employer where supervisor "on seven or eight occasions . . . used the word "n——r" when referring to certain African–American individuals," because "[a] reasonable jury could not find that such evidence of hostility toward other races establishes hostility toward [plaintiff] based on his Caucasian race").

[5] Because Di Donato failed to state a prima facie case of discrimination based on race or national origin, thereby requiring dismissal of his Title VII and section 1981 claims, the Court need not address KT&G USA's alternative argument that Di Donato lacks evidence that KT&G's legitimate, nondiscriminatory reason for terminating his employment was a pretext for unlawful discrimination.

co-workers. A "replacement" has not occurred when the employer distributes a plaintiff's former duties among co-workers. *E.g.*, *Griffin*, 567 F.App'x at 294; *Rexses*, 401 F.App'x at 868; *Dulin*, 1998 WL 127729 at *2–3.

In Murry's case, the parties agree that his job responsibilities were assumed by three KT&G USA employees. Park and Carol Boliter, Regional Sales Managers for KT&G USA, assumed Murry's sales responsibilities, and Jang assumed Murry's personnel responsibilities. *See* (Dkt. #30 at 6) (KT&G USA confirms that Murry's job duties were absorbed by co-workers Boliter, Park, and Jang following Murry's termination); (Dkt. #33 at 11) (Murry agrees that this fact is "not disputed"). It is also undisputed that the Regional Vice President positions held by Murry and his counterpart Waples were eliminated at the time Di Donato and Murry were terminated. Waples was reassigned within KT&G USA and, as with Murry, Waples's prior sales duties were assumed by multiple KT&G USA employees. *See* (Dkt. #30 at 6); (Dkt. #33 at 11).

Notwithstanding Murry's concession that his job duties were assumed by three existing KT&G USA employees, he asserts that Park replaced him because, (1) in January 2018, Park received a salary raise from $55,068 to $62,400, (2) Waples, the other former Regional Vice President, purportedly "worked in the same position as Park" and Waples's salary remained the same after Murry's discharge, and (3) Park supervised a number of Murry's former subordinates after Murry's departure. (Dkt. #33). None of Murry's contentions withstands scrutiny, much less undermines Murry's admission that his job duties were absorbed by multiple co-workers. To begin

13

with, Murry's salary as Regional Vice President, a position Park never held, was $100,000. Even with his salary raise, which occurred months after Murry's departure, Park's salary remained well below Murry's compensation level. Contrary to Murry's contentions, the disparity between his salary and Park's salary serves only to confirm, rather than refute, the fact that Park did not replace him. *See, e.g.*, *Smith v. City of Hamilton*, 34 F.App'x 450, 456 (6th Cir. 2002) (finding that a lower salary demonstrates that positions are not identical even when some tasks are the same); *Speck v. Agrex, Inc.*, 888 F.Supp.2d 867, 879 (N.D. Ohio 2012) ("Other evidence supports that Asami did not replace Plaintiff: First, Asami's salary was over $100,000 less than Plaintiff's.").

Further, Murry is mistaken regarding Waples's status after Murry's termination. As Murry has conceded, it is undisputed that KT&G USA reassigned Waples to a new position when KT&G USA restructured and eliminated Murry's and Waples's Regional Vice President positions. KT&G USA reassigned Waples to become Manager of National Sales Accounts, while Park served in a different position, Regional Sales Manager. *See* (Dkt. #30 at 6) (KT&G USA confirms that when Waples's Regional Vice President position was eliminated he was reassigned to Manager of National Sales Accounts); (Dkt. #33 at 11) (Murry does not dispute the elimination of Waples's Regional Vice President position and his reassignment as Manager of National Sales Accounts). Thus, contrary to Murry's assertion, the record is clear that Waples and Park did not serve in the same position at KT&G USA.

14

Finally, the fact that Park supervised a number of Murry's former subordinates does not show that he replaced Murry. Murry has acknowledged that Park already supervised a sales team during Murry's tenure with KT&G USA, and it is undisputed that both Park and Boliter assumed responsibility for managing Murry's former subordinates. In sum, the record confirms that there is no genuine issue of material fact that Murry was not replaced by someone outside his protected class.

Murry also asserts the same alternative argument made by Di Donato—that he established a prima facie case by showing that he was treated less favorably than other similarly situated employees outside his class. Like Di Donato, Murry points to (1) the racial composition of KT&G USA's senior management following his discharge, and (2) KT&G USA's failure to terminate Jang despite decreasing sales both before and after Murry's tenure with the company. Both arguments fail. As the Court has already explained, *see supra* Part I.D., Murry cannot establish a prima facie case of discrimination for his individual claim through general statistical evidence concerning the demographics of KT&G USA's management. *See Taylor*, 554 F.3d at 523. And Jang is not similarly situated to Murry. Murry served as Regional Vice President, reported to Di Donato, and worked only in the sales division of the company. Jang never served as Regional Vice President, reported to Hyun, and handled both sales and marketing duties before and after Murry's employment with KT&G USA.[6] *See Lee*, 574 F.3d at 259–60 (explaining that employees are not

---

[6] The only KT&G USA employee who is arguably "nearly identical" to Murry is Waples. Together with Murry, Waples served as a Regional Vice President under Di Donato

similarly situated if they have different supervisors, different work responsibilities, or work for different divisions of a company).[7]

For all these reasons, Murry has failed to establish a prima facie case of discrimination against KT&G USA. Summary judgment as to Murry is **GRANTED** in favor of KT&G USA, and Murry's claims are dismissed.[8]

## II.

### KT&G USA's Summary-Judgment Motion as to Plaintiff Wagoneka

According to Plaintiff Wagoneka, KT&G USA purported to eliminate Wagoneka's position upon her termination, but then replaced her two months later with a Korean individual. KT&G USA contends that Wagoneka's claim fails because Wagoneka voluntarily resigned, and a voluntary resignation is not actionable and cannot support a prima facie case of discrimination. Because there exists a genuine issue of material fact as to whether KT&G USA had an honest or reasonable belief that Wagoneka voluntarily resigned, KT&G USA's summary-judgment motion must be denied as to Wagoneka.

---

and had the same duties and responsibilities as did Murry. Waples, who shares the same protected class as Murry, remained under the employ of KT&G USA.

[7] Murry has offered no other evidence concerning Jang or otherwise showing that Murry was terminated because of his race or national origin. *See supra* n.4.

[8] Because Murry failed to state a prima facie case of discrimination based on race or national origin, requiring dismissal of his Title VII and section 1981 claims, the Court need not address KT&G USA's alternative argument that Murry lacks evidence that KT&G's legitimate, nondiscriminatory reason for terminating his employment was a pretext for unlawful discrimination.

**A.**

KT&G USA hired Wagoneka in 2016 to work in its General Affairs department in its Plano, Texas, headquarters. In April 2017, following a meeting with the company's Chief Financial Officer, T.J. Song, Wagoneka became agitated and walked out of KT&G USA's office.

What happened next is largely disputed by the parties. According to KT&G USA, after Wagoneka's meeting with Song, another company official, then-General Affairs Manager An Sik Kang, followed Wagoneka out of the office and spoke with her. Kang understood from this conversation that Wagoneka was planning to quit her job. KT&G USA maintains that, at that time, Kang asked Wagoneka to delay her resignation until after Kang returned from a scheduled vacation. Wagoneka, on the other hand, asserts that she never told Kang she wanted to quit or resign her position with KT&G USA.

It is undisputed that Kang told Song that Wagoneka was resigning, but would remain with KT&G USA until after Kang returned from his vacation, and that Song in turn informed the company's president, Hyun, that Wagoneka was resigning and would leave the company in the near future. KT&G USA states that during this same timeframe, April 2017, Song learned that Wagoneka had told coworkers that she had scheduled job interviews with other companies and had missed work to attend a job interview. Wagoneka disputes this assertion and has objected that Song's statement is inadmissible hearsay.

The parties agree that approximately two months later, on June 27, 2017, Wagoneka was still working at KT&G USA and emailed Kang, Song, and Hyun to

ask about an annual review and her bonus.[9] In the email, Wagoneka made no reference to leaving the company and instead noted that her annual review was due in early June and asked when the review would be completed. Wagoneka went on to inquire about whether she would receive bonuses she claimed were promised by the company.

The parties also agree that, on July 7, 2019, Wagoneka sent a follow-up email to Kang, Song, and Hyun, asking whether they had received her June 27 email. In her July 7 email, Wagoneka went on to state that she "[w]anted to follow up and find out what the plan is for my career with KT&G USA. It was told to me that my position will not be needed in the future. . . . [I]f this is correct I would like to know."

KT&G USA asserts that three days later, on July 10, 2017, Song and Kang met with Wagoneka in response to her email. According to KT&G USA, at that meeting, Song and Kang advised Wagoneka that they understood she planned to resign based on her April 2017 "announcement" to Kang. KT&G USA further avers that Wagoneka responded that she had never sent a written resignation letter and did not want to resign. According to KT&G USA, Kang and Song then informed Wagoneka that the company's management would consider her request to "rescind" her resignation, and Song would speak with Hyun about the issue. For her part, Wagoneka denies that

---

[9] KT&G USA has indicated that this email came "after Song and Kang returned from their vacations." (Dkt. #30 at 13). Wagoneka disputes this characterization to the extent that it implies that either of these company executives had returned from vacation just prior to Wagoneka's June 27 email. Wagoneka cites uncontroverted evidence that Kang returned from vacation in early May and Song returned from vacation in May or early June.

she took part in any meeting with Song and Kang on July 10 and disputes KT&G USA's account of this meeting in its entirety.

KT&G USA maintains that on July 12, 2017, Kang and Song learned that Wagoneka had begun informing office personnel that July 14, 2017, would be her last day. Based on this information, Song did not speak with Hyun about Wagoneka's request to rescind her resignation. Wagoneka disputes these allegations and objects to the evidence as inadmissible hearsay.[10]

The parties agree that, on July 14, 2017, Wagoneka emailed Kang and Song asking them to memorialize statements that she had eighty hours of paid time off and could take her vacation after KT&G USA found her replacement. The email reads as follows:

---

[10] Wagoneka has objected to four statements included in the declaration of KT&G USA executive T.J. Song. The statements by Song are as follows: (1) Kang informed Song that he spoke with Wagoneka in April 2017, and Wagoneka announced she would resign in the near future; (2) in April 2017, Song also learned that Wagoneka told co-workers that she had job interviews with other companies and missed work to attend an interview; (3) on July 11 or 12 of 2017, Song learned that Wagoneka had begun informing office personnel that July 14 would be her last day; and (4) based on the information about Wagoneka that he heard on July 11 or 12, Song believed that Wagoneka no longer wished to rescind her resignation. (Dkt. #30-6, ¶¶ 5–6, 9–10).

Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c)(1)–(2). Because KT&G USA has not offered the challenged statements allegedly made to Song by co-workers to prove the truth of the matters asserted therein, but rather only to show Song's state of mind regarding his alleged belief that Wagoneka voluntarily resigned, the statements are not hearsay. *See Schindler v. Seller*, 474 F.3d 1008 (7th Cir. 2007) ("[A] statement offered to show its effect on the person who heard the statement is not hearsay."); *see also Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) ("[W]hen an employer discharges an employee based on a complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith." (internal quotation marks omitted)). For this reason, Wagoneka's objection is **OVERRULED**.

> Can you put it in writing for me that I have 80 hours of PTO. So that I can
> see how much I have. Can you also state what you told me in the meeting
> on Monday May 10th, 2017, That I can use my 10 days of vacation after
> you find my replacement.[11]

On the same day, Wagoneka also sent a farewell email to her KT&G USA coworkers:

> I wanted to let each of you know personally before you hear it from
> anyone else. I will no longer be with KT&G USA after today, this year
> and a half has been a true learning experience. I hope you all succeed
> above and beyond your expectations. I will more than likely return back
> to my original degree as a Nurse and radiology technician, until I find
> something in my new degree of Human Resource Management that I
> will complete in October. I wish you all the best and good luck. If you
> need anything you can contact Monique or Don. It has been a true
> pleasure watching this company grow.

Wagoneka never returned to KT&G USA's offices after July 14, 2017. According to

Wagoneka, she never told anyone at the company that she planned or wanted to

resign. Instead, on July 14, 2017, she met with Song and Kang and they informed her

that her position was no longer needed and that July 14 was her final day. In KT&G

USA's view, on July 14, 2017, Wagoneka followed through with her plan to resign.

## B.

A genuine issue of material fact exists whether KT&G USA discriminated

against Wagoneka. Neither party disputes that Wagoneka is a member of a protected

class, was qualified for her position, and was replaced by someone outside of her

protected class. However, the parties dispute whether Wagoneka was subject to an

adverse employment action. KT&G USA argues that Wagoneka was not subject to an

adverse employment action and, therefore, cannot establish a prima facie case of

---

[11] The reference to the month of May could be a typographical error. In fact, May 10, 2017, was a Wednesday, but July 10, 2017, was a Monday. KT&G USA has indicated that Wagoneka meant July 10 in her July 14 email.

discrimination. Specifically, KT&G USA claims that it had an honest belief that Wagoneka voluntarily resigned from the company in July 2017 after making her intention to do so known to a company executive in April 2017. For her part, Wagoneka maintains that she did not resign and likewise never told anyone at KT&G USA that she intended to resign. According to Wagoneka, KT&G USA could not have had an honest belief that she voluntarily resigned because her departure resulted solely from the company's decision to terminate her and replace her with a Korean female.

As an initial matter, acceptance of a voluntary resignation is not an adverse employment action. *See Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) ("A resignation is actionable under Title VII . . . only if the resignation qualifies as a constructive discharge.");[12] *see also Curby v. Solutia, Inc.*, 351 F.3d 868, 872 (8th Cir. 2003) ("An employee cannot submit a resignation and then claim the employer's acceptance of the resignation is an adverse employment action."). Likewise, a discrimination case fails when an employer reasonably or honestly believes that the employee has voluntarily resigned. *See, e.g.*, *Haney v. Brennan*, 390 F.Supp.3d 633, 642 (E.D. Pa. 2019) (granting summary judgment because plaintiff had submitted a resignation letter and management reasonably believed that plaintiff resigned and planned to accept a job with another employer); *Jefferson v. Xerox Corp.*, No. 4:01-CV-0919-A, 2002 WL 1841011, at *4 (N.D. Tex. Aug. 8, 2012) (granting summary judgement because the employer reasonably

---

[12] Wagoneka does not plead or claim constructive discharge. *See* (Dkt. #19).

believed that plaintiff had resigned when he took his personal belongings and returned his security access card).

Viewing the evidence in the light most favorable to Wagoneka, KT&G USA has not proven that it had an honest or reasonable belief that Wagoneka resigned her position. Instead, the record reflects sharply conflicting versions of events between Wagoneka and KT&G USA, largely unsupported by any documentary evidence, resulting in two contradictory-but-plausible scenarios. In one scenario, Wagoneka notified the company of her planned resignation in April 2017 and ultimately followed through on that plan in July. In this version of events, there would be little doubt that KT&G USA would have honestly believed that Wagoneka both intended to and did resign from her employment with the company. In a second, equally plausible scenario, Wagoneka at no time told anyone at KT&G USA that she intended to resign, in writing or otherwise, and instead the company unilaterally terminated her employment in July 2017. In this second scenario, KT&G USA could not have held an honest belief that Wagoneka had voluntarily resigned.

In this regard, Wagoneka's case differs from the cases relied upon by KT&G USA. First, there is no undisputed evidence establishing that Wagoneka expressed an intent to resign. Unlike the *Haney* and *Gearhart v. Sears, Roebuck & Co., Inc.*, 27 F.Supp.2d 1263 (D. Kan. 1998) decisions cited by KT&G USA in support of its motion, there is no letter or other written communication from Wagoneka at any time saying that she intended to resign. *See Haney*, 390 F.Supp.3d at 636–37, 636 n.6 (noting that plaintiff submitted a formal resignation letter stating that he resigned

and had been offered a position with another company); *Gearhart*, 27 F.Supp.2d at 1268 (recounting that after the plaintiff, a Sears employee, had been caught buying items for personal use with a company credit card, she returned several of these items together with a $3,000 check payable to Sears and a note to her supervisor saying it was in the best interest of the company for her to leave). To the contrary, Wagoneka's email to several KT&G USA executives on June 27, 2017, approximately two months after a conversation with Kang in which she allegedly told him she was going to resign, says nothing about her departing the company. Instead, the email asks about her performance evaluation and expected bonuses. Wagoneka's next email to the same company executives, on July 7, 2017, asks about the plan for her future at KT&G USA, states that she has been told that her position is being eliminated, and asks if that is true. Although Wagoneka's last emails to co-workers and company executives reference her departure, they do not not indicate that she was leaving voluntarily.

There is also no undisputed evidence that Wagoneka undertook some other action that could be understood to convey her intent to leave the company. The *Jefferson* case cited by KT&G USA provides an example of such a situation. In *Jefferson*, it was undisputed that the plaintiff employee had removed his personal items and turned in his access card. 2002 WL 1841011, at *2. The *Jefferson* court concluded that such actions could lead an employer to reasonably believe the employee had resigned. *Id*. at *4.

The record in this case, however, is devoid of evidence of any similar action on Wagoneka's part demonstrating an intent to resign from KT&G USA. KT&G USA points to a statement from its CFO, Song, stating that, in April 2017, he heard from someone at the company—not Wagoneka—that she had job interviews with other companies and had missed work to attend at least one interview. Wagoneka, however, disputes Song's statement both as to its substance, i.e., that Wagoneka had attended interviews, and that anyone provided such information to Song. Even if the Court credited that this disputed information was provided to Song, an employee attending interviews with other employers does not necessarily imply a firm intent to resign. KT&G USA also points to another statement from Song that on July 11 or 12, 2017, he learned from another company employee—again, not Wagoneka—that she had informed co-workers that July 14 would be her last day. Wagoneka also disputes that this occurred.

These contested recollections of a KT&G USA executive do not support a summary judgment in favor of KT&G USA as to Wagoneka's discrimination claim, particularly given the timeline and record before the Court. KT&G USA's motion turns on Wagoneka's purportedly demonstrated intent to resign in April 2017 and subsequent "resignation" in July 2017. But throughout that period of time, and even afterward, Wagoneka's alleged intent to resign and subsequent "voluntary" resignation were not memorialized in writing by KT&G USA. And Wagoneka herself never expressed in writing an intent to resign. Instead, the only contemporaneous written communications that are before the Court concerning Wagoneka's departure,

specifically Wagoneka's emails in June and July 2017 to company executives, directly contradict KT&G USA's contention that Wagoneka voluntarily resigned from the company.

Finally, leaving aside the minimal written records concerning Wagoneka's departure, which controvert rather than confirm Wagoneka's alleged intent to resign, the recollections of the parties, reflected in their sworn testimony, are conflicting. Company executive Kang says Wagoneka told him in April 2017 that she intended to resign. Wagoneka denies that this conversation ever occurred or that she told any KT&G USA employee that she intended to resign. According to Kang and Song, they spoke to Wagoneka on July 10, 2017, three days after her email asking about her future at the company. According to Kang and Song, they advised Wagoneka that they thought she planned to resign, and Wagoneka responded by advising them that she did not intend to resign, had not sent a resignation letter, and wanted to stay with the company. Song then allegedly told Wagoneka that he would speak with Hyun about Wagoneka's request to "rescind" her resignation. According to KT&G USA, Song ultimately did not speak with Hyun about this issue because he heard from a co-worker on July 11 or 12 that Wagoneka had told fellow employees that July 14 would be her last day. Wagoneka contends that she did not meet with Song and Kang on July 10.[13]

---

[13] KT&G USA has argued that Wagoneka's contention that she did not meet with Song and Kang is belied by her email of July 14, which is most plausibly read to directly reference that meeting. The Court agrees that it appears Wagoneka met with Song and Kang on July 10, but even assuming this meeting took place, it does not negate the genuine issues of material fact concerning the question whether KT&G USA reasonably believed that Wagoneka intended to resign. The lack of any undisputed evidence demonstrating

In sum, KT&G USA has failed to establish that there exists no genuine issue of material fact that it held an honest or reasonable belief that Wagoneka was voluntarily resigning. To the contrary, the record before the Court shows that Wagoneka's telling of the events relevant to her departure from KT&G USA cannot be reconciled with the version recounted by KT&G USA's executives, and neither side can point to undisputed, uncontroverted, or otherwise conclusive evidence establishing the truth of their contentions. Under the circumstances, KT&G USA's motion for summary judgment as to Wagoneka must be **DENIED**.

### III.

For all the foregoing reasons, it is **ORDERED** that Defendant KT&G USA's Motion for Summary Judgment, (Dkt. #30), is **GRANTED in part** and **DENIED in part**.[14] The motion is **GRANTED** as to the claims asserted by Plaintiffs Rick Di Donato and Ashley "Ed" Murry and **DENIED** as to the claims asserted by Plaintiff Tracey Wagoneka. It is further **ORDERED** that Plaintiffs Rick Di Donato and Ashley "Ed" Murry take nothing on their claims against Defendant KT&G USA and that such claims are **DISMISSED with prejudice**.

---

Wagoneka's alleged intent to resign, written or otherwise, and the parties' sharply conflicting accounts of verbal communications between Wagoneka and various KT&G USA managers between April through July 2017, do not support KT&G USA's contention that it is entitled to summary judgment on this issue.

[14] This order also disposes of the redacted version of this summary-judgment motion filed by KT&G USA. (Dkt. #56).

**So ORDERED and SIGNED this 14th day of October, 2020.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE